POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK CALHOUN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KORNER, and DIXIT JOSHI, | |
| Defendants. | |

Plaintiff Patrick Calhoun ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Credit Suisse Group AG ("Credit Suisse" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse securities between December 1, 2022 and February 17, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services

3.      In October 2022, Credit Suisse began experiencing a sharp increase in customer outflows, or withdrawals of client funds, after a series of quarterly losses and risk and compliance failures significantly decreased the Company's American Depositary Share ("ADS") price.

4.      On December 1, 2022, Credit Suisse's Chairman, Defendant Axel P. Lehmann ("Lehmann") stated in an interview with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

5.      The following day, in an interview with *Bloomberg Television*, Defendant Lehmann reiterated his previous statements, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".

6.    Following Defendant Lehmann's statements, Credit Suisse's ADS price rose $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2, 2022.

7.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendant Lehmann's representations in December 2022, the sharp increase in customer outflows Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.    On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results.   The press release revealed that, contrary to Defendant Lehmann's prior statements, large customer outflows had continued through year-end 2022.  Specifically, the press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

3

9.     On this news, Credit Suisse's ADS price fell $0.56 per ADS, or 15.64%, to close at $3.02 per ADS on February 9, 2023.

10.     Then, on February 21, 2023, *Reuters* reported that the Swiss Financial Market Supervisory Authority ("FINMA"), was reviewing Defendant Lehmann's previous comments regarding customer outflows.

11.     On this news, Credit Suisse's ADS price fell another $0.10 per ADS, or 3.31%, to close at $2.92 per ADS on February 21, 2023.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Credit Suisse's most recent annual report on Form 20-F, as of the close of December 31, 2021, there were 2,569,684,509 of the Company's shares outstanding.  Credit

Suisse's securities trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Credit Suisse's securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.    Plaintiff, as set forth in the attached Certification, acquired Credit Suisse securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant Credit Suisse is a Swiss corporation with principal executive offices located at Paradeplatz 8, 8001 Zurich, Switzerland.  Credit Suisse's ADSs trade in an efficient market on the NYSE under the ticker symbol "CS".

19.    Defendant Lehmann has served as the Chairman of Credit Suisse's Board of Directors at all relevant times.

20.    Defendant Ulrich Korner ("Korner") has served as Credit Suisse's Chief Executive Officer at all relevant times.

21.     Defendant Dixit Joshi ("Joshi") has served as Credit Suisse's Chief Financial Officer at all relevant times.

22.     Defendants Lehmann, Korner, and Joshi are sometimes referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Credit Suisse's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Credit Suisse, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Credit Suisse and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

26.    In October 2022, Credit Suisse began experiencing a sharp increase in customer outflows, or client withdrawals of funds, after a series of quarterly losses and risk and compliance failures significantly decreased the Company's ADS price.

27.    Indeed, in an article entitled "Credit Suisse Warns of $1.6 Billion Loss After Clients Pull Money," published on November 23, 2022, the *Wall Street Journal* stated, in relevant part:

> Credit Suisse Group AG warned it would lose around $1.6 billion in the fourth quarter after customers pulled their investments and deposits over concerns about the bank's financial health.
>
> The warning of a big pretax loss pushed Credit Suisse's shares to a new closing low, below a previous nadir hit in late September as concerns swirled about the bank's financial health.
>
> Switzerland's No. 2 bank by assets said outflows were around 6% of its total $1.47 trillion assets, or around $88.3 billion, between Sept. 30 and Nov. 11. Customers in its wealth-management arm—its main business serving the world's rich—removed $66.7 billion from the bank. Credit

Suisse in late October said that a social-media frenzy around its finances was causing large outflows. The bank typically attracts at least $30 billion in net new assets in a year and hasn't posted an annual net outflow since 2008, according to its filings.

\*\*\*

The fast pace of withdrawals meant the bank's liquidity fell below some local-level requirements, the bank said. It said it maintained its required group-level liquidity and funding ratios at all times. Banks must keep enough liquid assets on hand to meet expected cash outflows in a 30-day period, under post-financial-crisis-era rules.

## Materially False and Misleading Statements Issued During the Class Period

28.    The Class Period begins on December 1, 2022, when Credit Suisse's Chairman, Defendant Lehmann, stated in an interview streamed online with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

29.    That same day, *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm.'"  The article, which quoted Defendant Lehmann, stated, in relevant part:

> The chair of Credit Suisse said clients had started to return to the bank after pulling tens of billions of dollars of assets following a "social media storm" at the start of October.
>
> Axel Lehmann said withdrawals had flattened across the group and had started to reverse in the Swiss domestic business, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It was a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It was a storm in the retail and partially

in the wealth management segment, in particular in Asia, where we had really massive outflows for two to three weeks.

"The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."

He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."

Credit Suisse revealed last month that rich clients had withdrawn about SFr63.5bn ($67.4bn) since the start of October — equivalent to 10 per cent of wealth management assets — following a spate of social media rumours about its financial health.

Spreads on the group's credit default swaps surged in early October, which indicated investors were becoming increasingly bearish on the group, after a stream of rumours were posted on social media and web forums about the bank's imminent collapse.

\*\*\*

Lehmann and Körner, who worked as senior executives at UBS, have since set about devising a radical plan for Credit Suisse that will involve the bank cutting SFr2.5bn of costs, jettisoning 9,000 jobs and retreating from investment banking over the next three years.

\*\*\*

Lehmann added that the company had several "offers on the table" from companies that were willing to back the new venture and was in discussions with the US Federal Reserve over its balance sheet, structure and governance.

Credit Suisse had previously said an unnamed investor had pledged $500mn.

30.    On December 2, 2022, in an interview with *Bloomberg Television*, Lehmann reiterated his statements from the previous day, reassuring investors that

as of November 11, 2022, customer outflows had "basically stopped".  In the same

interview, Lehmann characterized the October increase in customer outflows as

simply a "two-to-three-week event."

31.    Following Defendant Lehmann's statements, Credit Suisse's ADS

price climbed $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2,

2022.

32.    On December 8, 2022, Credit Suisse issued a press release

"announc[ing] [a] successful rights offering."  The press release quoted Defendant

Ulner, as stating, in relevant part:

> "Over recent weeks we have made important strides towards
> implementing the strategic actions outlined at our October 27 strategic
> review. The successful completion of the capital increase is a key
> milestone for the new Credit Suisse. It will allow us to further support
> our strategic priorities from a position of capital strength and create a
> simpler, more stable and more focused bank built around client needs,
> and generating value for shareholders."

33.    In response to this announcement, several market analysts published

articles reporting on the impact of the successful rights offering.  For example,

*Bloomberg* published an article entitled "Credit Suisse Offering Set to Sail Through

After Wild Ride," which stated, in relevant part:

> Banks handling Credit Suisse Group AG's rights offer expect nearly all
> of those rights to be exercised, spelling success for a capital raise that
> looked shaky as recently as last week.
>
> Lenders arranging the deal currently expect investors to take up well
> above 90% of the stock on offer, the people said, asking not to be

identified because the information is private. The banks don't currently anticipate needing to hold a sizeable amount of Credit Suisse stock on their books afterwards, according to the people.

Any remaining amount is expected to be small enough that banks will be able to slowly sell the shares in the market, the people said. If needed, they will also be able to lean on sub-underwriters, major investors that have agreed to snap up a certain amount of unsold stock.

\*\*\*

The bank is raising 4 billion francs in two steps to shore up its balance sheet as it seeks to put to rest concerns about its financial position after billions in losses over the past two years, recent client defections and asset outflows. The Saudi National Bank was an anchor investor in the capital raise, committing to invest about 1.5 billion francs, mostly through a private placement last month.

\*\*\*

Credit Suisse needs the funds to help pay for the exit of large parts of its investment bank and 9,000 job cuts. The bank has warned that it will have a fifth straight quarter of losses as it reels from years of scandals and missteps that have eroded investor confidence and sent clients fleeing.

\*\*\*

A successful rights offer spells the end of a wild ride for the troubled Swiss bank's stock over the past weeks, when at one point a 13-day losing streak took the shares down to near the price of what had supposed to be a heavily-discounted offer. ***Comments by Chairman Axel Lehmann on Friday that the bank had stopped massive outflows provided some relief, only for the stock to resume its downward slide on Tuesday***.

\*\*\*

***Investors late last week took comfort from comments by Chairman Axel Lehmann that the main indicators of the bank's financial***

*stability were strong and that its level of liquidity was improving after declines in recent weeks. The Zurich-based bank's liquidity coverage ratio, which measures the quantity of easily-sold assets available to meet obligations, is currently at 140%, Lehmann said*.

(Emphasis added.)

34.    The statements referenced in ¶¶ 28-30 and 32-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendant Lehmann's representations in December 2022, the sharp increase in customer outflows Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

35.    On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results and which revealed large customer outflows through year-end 2022.   The press release reported customer outflows of *110.5 billion Swiss*

*francs* in the final three months of 2022, a figure which far exceeded market expectations.

36.    On this news, Credit Suisse's ADS price fell $0.56 per ADS, or 15.64%, to close at $3.02 per ADS on February 9, 2023.

37.    Then, on February 21, 2023, *Reuters* published an article entitled "Exclusive: Credit Suisse chairman's comments draw scrutiny from financial watchdog -sources."  The article stated, in relevant part:

> The Swiss financial regulator is reviewing remarks made by Credit Suisse Group [] Chairman Axel Lehmann about outflows from the lender having stabilised in early December, two people with knowledge of the matter have told Reuters.
>
> Finma is seeking to establish the extent to which Lehmann, and other Credit Suisse representatives, were aware that clients were still withdrawing funds when he said in media interviews that outflows had stopped, said the two people, who asked to remain anonymous because the matter was not public.
>
> The development sent the embattled bank's shares down as much as 5% on Tuesday. The bank's stock, at roughly 2.62 Swiss francs, is around its lowest in decades. The cost of insuring exposure to the bank also rose following the news.
>
> A spokesperson for Finma declined to comment. A Credit Suisse spokesperson said the bank did "not comment on speculation." Lehmann did not reply to an email seeking comment.
>
> Lehmann told the Financial Times in an interview streamed online on Dec. 1 that after strong outflows in October, they had "completely flattened out" and "partially reversed".
>
> The following day he told Bloomberg Television that outflows had "basically stopped."

13

Credit Suisse shares rose 9.3% on Dec. 2.

The regulator is reviewing whether Lehmann's statements were potentially misleading, said the people, with one adding that Lehmann may not have been briefed correctly before he made those comments.

Luzerner Kantonalbank described the inquiry, although not a formal investigation, as another blow for Credit Suisse.

"Was Axel Lehmann insufficiently informed or did he consciously or did he deliberately gloss over the matter?" said analyst Daniel Bosshard.

"Whatever the case, this is yet another inglorious chapter in the history of Credit Suisse."

Credit Suisse said on Feb. 9, when it reported its annual results, that clients withdrew 110.5 billion Swiss francs ($119.65 billion) from Switzerland's second-largest bank in the last three months of 2022.

Those outflows exceeded market expectations and rounded off a weak set of results that led to the stock falling about 15% on the day.

In response to a question on the distribution of withdrawals in the period, Chief Executive Ulrich Koerner told analysts that day that more than 85% of the outflows in the last quarter were in October and November, according to a transcript of the call.

That led analysts at Citigroup to conclude in a note to clients that management effectively indicated 15% of the outflows happened in December. Finma's scrutiny adds to the challenges faced by Credit Suisse, which has been rocked by scandals in recent years. The lender has embarked on a sweeping overhaul to restore profitability by exiting certain investment banking activities and focusing on managing money for the wealthy. In early October a social media storm triggered by an unsubstantiated report about the bank's financial health prompted wealthy customers to move deposits elsewhere. The bank said at the time it was pushing ahead with its restructuring and remained close to its clients.

Responding to a Reuters request for comment on the Feb. 9 results, Finma said in a statement that while Credit Suisse's liquidity buffers had a stabilising effect, the regulator "monitors banks very closely during such situations," referring to the outflows, which "were indeed significant" in the fourth quarter. It did not elaborate further.

38.   On this news, Credit Suisse's ADS price fell another $0.10 per ADS, or 3.31%, to close at $2.92 per ADS on February 21, 2023.

39.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Credit Suisse securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse securities were actively traded on the NYSE.  While the exact number of Class members is unknown to

Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Credit Suisse;

- whether the Individual Defendants caused Credit Suisse to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Credit Suisse securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Credit Suisse securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Credit Suisse securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

49.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Credit Suisse securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Credit Suisse's finances and business prospects.

53.     By virtue of their positions at Credit Suisse, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Credit Suisse, the Individual Defendants had knowledge of the details of Credit Suisse's internal affairs.

55.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Credit Suisse.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Credit Suisse's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Credit Suisse securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Credit Suisse's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Credit Suisse securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Credit Suisse securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Credit Suisse securities at

prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Credit Suisse securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Credit Suisse securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

59.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.     During the Class Period, the Individual Defendants participated in the operation and management of Credit Suisse, and conducted and participated, directly and indirectly, in the conduct of Credit Suisse's business affairs.  Because of their senior positions, they knew the adverse non-public information about Credit Suisse's misstatement of income and expenses and false financial statements.

61.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Credit Suisse's financial condition and results of operations, and to correct promptly any public statements issued by Credit Suisse which had become materially false or misleading.

62.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Credit Suisse disseminated in the marketplace during the Class Period concerning Credit Suisse's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Credit Suisse to engage in the wrongful acts

complained of herein. The Individual Defendants, therefore, were "controlling persons" of Credit Suisse within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Credit Suisse securities.

63.     Each of the Individual Defendants, therefore, acted as a controlling person of Credit Suisse.  By reason of their senior management positions and/or being directors of Credit Suisse, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Credit Suisse and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Credit Suisse.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2023                    Respectfully submitted,

                                        POMERANTZ LLP

                                        */s/ Thomas H. Przybylowski*
                                        Thomas H. Przybylowski
                                        Jeremy A. Lieberman
                                        (*pro hac vice* application forthcoming)
                                        J. Alexander Hood II
                                        (*pro hac vice* application forthcoming)
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (917) 463-1044
                                        tprzybylowski@pomlaw.com
                                        jalieberman@pomlaw.com
                                        ahood@pomlaw.com

                                        BRONSTEIN, GEWIRTZ &
                                        GROSSMAN, LLC
                                        Peretz Bronstein
                                        (*pro hac vice* application forthcoming)

60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, _Patrick Calhoun_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Credit Suisse Group AG ("Credit Suisse") and

authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Credit Suisse securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange

Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Credit Suisse securities during the Class Period as specified in

the Complaint, including providing testimony at deposition and trial, if necessary.  I understand

that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Credit Suisse securities during the

Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>March 1, 2023</u>
             **(Date)**

DocuSigned by:

*Patrick Calhoun*

81B5A44FFEC0441...
             **(Signature)**

Patrick Calhoun

             **(Type or Print Name)**

**Credit Suisse Group AG (CS)**                                          **Patrick Calhoun**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 2/3/2023 | 1,400 | $3.5899 |